**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| VALERIE MAHTANI, CARLOS MUNOZ, AND MICHELLE MUNOZ, *on behalf of themselves and all others similarly situated*<br><br>Plaintiff,<br><br>WYETH and ANIMAL HEALTH INTERNATIONAL, INC.<br><br>Defendants. | Civil Action No. 08-6255 (KSH)<br><br>**OPINION** |

**KATHARINE S. HAYDEN, U.S.D.J.**

**I. Introduction**

The named plaintiffs in this action, Valerie Mahtani, Carlos Munoz, and Michelle Munoz, used defendant Wyeth's flea and tick treatment, ProMeris, on their dogs and claim that it (1) failed to eradicate their dogs' fleas and ticks and (2) caused their dogs to suffer lethargy, vomiting, and diarrhea. They assert causes of action for violation of the New Jersey Consumer Fraud Act ("NJCFA"), unjust enrichment, and breach of warranty, and in this motion, they seek to certify a class consisting of all purchasers of ProMeris in the United States.

**II. Facts**

**A. ProMeris: Its Ingredients and Function**

In 2007, Wyeth's Fort Dodge Animal Health ("FDAH") operation, which is based in Princeton, N.J., introduced to the market ProMeris, a topical flea and tick treatment for dogs. ProMeris, which is applied with an applicator at the base of the dog's neck, contains two active ingredients, metaflumizone and amitraz. (Flea Biology and Epidemiology, attached to Chaleff

1

Aff. as Ex. J; Letter from Dr. Wang to Dr. Laws, attached to Chaleff Aff. as Ex. A.)  Other

inactive ingredients hold the active ingredients in solution and assist the distribution of the active

ingredients throughout the dog's coat.  (Veterinary Parasitology Vol. 150, attached to George

Decl. as Ex. 4, at 197.)  Consumers can only obtain the product from their veterinarian.

(Hoffman Dep. 41:17–42:9.)  While amitraz had previously been used on animals to treat mange,

metaflumizone was relatively new with regard to the treatment of fleas.  (Plunkett Report,

attached to George Decl. as Ex. 3, ¶¶ 17, 48, 49.)  Due to the potential for amitraz to cause harm

when it enters the bloodstream, Mitaban, a prescription-only dog-bathing product that included

amitraz, came accompanied by detailed warnings about potential adverse effects.  (Chaleff Dep.

24:10–18; Boeckh Dep. 159:7–10, 160:5–16; Mitaban Package Insert, attached to George Decl.

as Ex. 7.)  The ProMeris packaging indicated that the product was safe and effective for dogs

eight weeks of age and older.  (ProMeris Packaging, attached to George Decl. as Exs. 8–9;

ProMeris Brochure, attached to George Decl. as Ex. 10.)  The warning printed on the ProMeris

packaging is as follows:

> For external use only.  For use on dogs only.  DO NOT USE ON ANY
> ANIMALS OTHER THAN DOGS.  Do not use on puppies younger than 8 weeks
> of age.  Certain medications can interact with pesticides.  Consult a veterinarian
> before using this product on aged, debilitated, medicated, pregnant or nursing
> animals.  Individual sensitivities, while rare, may occur after the use of any
> pesticide product.  If skin irritation, change in behavior, vomiting or diarrhea is
> observed and persists after the use of the product, call your veterinarian
> immediately.

(ProMeris Packaging, attached to George Decl. as Exs. 8–9; ProMeris Brochure, attached to

George Decl. as Ex. 10.)  In addition to this warning, the ProMeris packaging included a limited

warranty and disclaimer.  It stated,

> Directions for use of this product are based upon tests believed to be reliable.  The
> use of this product being beyond the control of the seller, no guarantee, express or

implied, is made as to the effects of such use or the results to be obtained if not used in accordance with printed directions and established safe practice.

(ProMeris Packaging, attached to George Decl. as Exs. 8–9; ProMeris Brochure, attached to George Decl. as Ex. 10.)

### B. Tests and Studies of ProMeris

Before introducing ProMeris to the market, Wyeth conducted efficacy, animal safety, and toxicology studies requested by the EPA. (FDAH Notes from Aug. 29, 2002 Meeting with EPA, attached to Chaleff Aff. as Ex. B.) The efficacy testing consisted of eight studies performed by outside contract researchers, which determined that ProMeris had greater than 90 percent effectiveness and that water immersion and shampooing slightly reduced the product's effectiveness. (ProMeris Efficacy Review, attached to Chaleff Aff. as Ex. G.) Two of the studies used Frontline, a leading flea and tick control product, as a positive control to which they compared ProMeris. (*Id.*) In each study, ProMeris's performance was almost identical to Frontline's. (*Id.*) The safety and toxicology testing showed no significant adverse reactions; while one dog died, FDAH determined that the death was unrelated to ProMeris. (Rugg Dep. 82:10–87:17.) In April 2006, the EPA classified the efficacy studies as acceptable. (ProMeris Efficacy Review, attached to Chaleff Aff. as Ex. G.) After some negotiations between FDAH and the EPA regarding the content of the packaging, the EPA registered ProMeris on August 10, 2007. (ProMeris Registration, attached to Chaleff Aff. as Ex. I.)

The EPA-requested studies were not the only ones conducted. A 2007 study published in the journal Veterinary Parasitology tested ProMeris for efficacy against a non-treated control, a placebo control, and fipronil, the active ingredient in Frontline. (Veterinary Parasitology Vol. 150, attached to George Decl. as Ex. 4, at 209, 213.) ProMeris proved to be at or very near 100 percent efficacy up to 28 days after treatment, when its effectiveness dipped to 98.8 percent. (*Id.*

at 214.)  Frontline, meanwhile was at or near 100 percent efficacy throughout the 42-day study.

(*Id.*)  In addition, Wyeth conducted a field study in Europe prior to the launch of ProMeris in the

United States.  In that study, 293 dogs were treated with ProMeris and 149 were treated with

Frontline; of the 293 dogs treated with ProMeris, 12, or 4 percent, showed adverse reactions that

were considered possible, probable, or likely results of treatment.  (ProMeris Reference Manual,

attached to George Decl. as Ex. 30, at Canine Safety 17.)  Furthermore, FDAH conducted a post-

launch study of 263 dogs owned by FDAH clients and observed lethargy in only one dog.

(Chaleff Aff. ¶ 30.)  FDAH therefore determined that improper application was likely at fault for

adverse events that had been reported.  (*Id.* ¶ 31.)

On top of their contentions about the implications of the ProMeris testing—specifically,

that the testing demonstrates that ProMeris is harmful and less effective than Frontline—

plaintiffs attack Wyeth for the tests they failed to conduct.  According to plaintiffs, Wyeth failed

to perform tests to determine how much amitraz could be introduced into a dog's bloodstream

before it started to affect the health of the dog.  (Boeckh Dep. 94:11–95:4, 183:12–16.)

### C. ProMeris's Post-Launch Performance

ProMeris was launched in October 2007.  Thereafter, as Wyeth expected, customers

began to call the company to report adverse effects their dogs had experienced.  According to

Wyeth, this was consistent with the "new product effect," whereby adverse event reports spike

and then decrease over time as consumers come to know and understand the product's

characteristics and effects.  (Letter from FDAH to EPA, attached to Chaleff Aff. as Ex. L.)

Among these reports were some noting the presence of skin conditions similar to autoimmune

reactions to *pemphigus foliaceus* ("PF") and skin burns.  (Lenz Dep. 88:1–89:24; Wallace Email,

attached to George Decl. as Ex. 28.)  Plaintiffs, through their expert Laura Plunkett, contend that

these problems were caused by the fact that ProMeris can enter the bloodstream by absorbing through the skin and through licking and grooming. (Plunkett Report, attached to George Decl. as Ex. 3, ¶ 22.) Plaintiffs claim that Wyeth designed ProMeris to absorb into the skin despite the potential for amitraz to enter the bloodstream, and that Wyeth intended for ProMeris to spread through a dog's coat despite the potential for a dog to ingest enough of the active ingredients to cause lethargy and other adverse effects. (*Id.* ¶¶ 20, 31.)

The number of reported adverse events, however, was small compared to ProMeris's sales. Out of 2,211,990 ProMeris doses sold in 2008, Wyeth received 3,195 adverse event reports, equivalent to approximately .14 percent of the total doses sold. (Chaleff Aff. ¶ 33.) Wyeth asserts that this percentage is within the parameters of the new product effect (*id.*), while plaintiffs assert that the proportion of adverse events reported to the EPA in 2009 that were linked to ProMeris exceeded the product's market share. (Enhanced Adverse Effect Reporting to EPA for ProMeris for Dogs, attached to George Decl. as Ex. 46.) In addition, plaintiffs suggest that the adverse reporting statistics are understated.

According to plaintiffs, Wyeth did not properly respond to the adverse event reports. (Moving Br. at 19.) Plaintiffs' expert states that even trace levels of amitraz could be linked to lethargy. (Plunkett Report, attached to George Decl. as Ex. 3, ¶ 40.) Based on this fact and other test results, plaintiffs assert, Wyeth considered replacing amitraz with another active ingredient while maintaining publicly that improper application was really to blame. (Boeckh Dep. 131:7–18; FDAH Meeting Notes, attached to George Decl. as Ex. 48; ProMeris Brainstorming PowerPoint, attached to George Decl. as Ex. 49; Veterinarian Technical Manual, attached to George Decl. as Ex. 12; 2008 Dear Doctor Letter, attached to George Decl. as Ex. 13; 2009 Dear Doctor Letter, attached to George Decl. as Ex. 14.) Plaintiffs also assert that at the time

ProMeris was introduced, Frontline and Advantage were effective, well established products, and

that ProMeris was better than nothing but inferior to Frontline and Advantage and Wyeth knew

it.  (ProMeris Launch Doc., attached to George Decl. as Ex. 16, at 2; Development

Recommendation, attached to George Decl. as Ex. 21, at Tbls. 3, 4, 10, 12, 13.)  Since the events

underlying this action, Wyeth, which is now owned by Pfizer, has decided to discontinue

ProMeris.  (Oral Arg. Tr. 4:24–5:22.)

### D. The Experiences of the Named Plaintiffs

The named plaintiffs claim that ProMeris either did not work or caused harm to their

dogs.  Michele and Carlos Munoz, of Kensington, Maryland, bought ProMeris from their

veterinarian to use on their dog, Goldie.  (Michelle Munoz Dep. 155:18–21.)  They applied it to

the dog on August 19, 2008, after which the dog became agitated and then lethargic.  (*Id.* 181:1–

5.)  According to Michelle Munoz, Goldie had bloody diarrhea and vomited in the kitchen that

night, and the next day, she was still lethargic.  (*Id.* 187:4–19.)  On August 21, the Munozes

noticed that Goldie was still lethargic and had developed lameness in one of her front legs.  (*Id.*

196:23–197:4.)  Because their usual veterinarian, Dr. Ira Silver, was away on vacation, they went

to see Dr. Jeffrey Zolkiewicz, who administered Antisedan, an amitraz antidote.  (Zolkiewicz

Dep. 70:3–16.)  While Carlos Munoz testified that Zolkiewicz told them ProMeris may have

caused their dog's problems, Michelle Munoz stated that no doctor or veterinarian ever told them

that ProMeris did in fact cause Goldie's illness.  (Carlos Munoz Dep. 95:9–16; Michelle Munoz

Dep. 215:12–216:8.)  In any event, despite Zolkiewicz's administration of Antisedan, Goldie

remained lethargic and lame in one leg on August 22.  (Michelle Munoz Dep. 228:3–8.)  The

Munozes again took the dog to the animal hospital, where Dr. Martine Moore prescribed

Rimadyl, an anti-inflammatory drug.  (*Id.* 231:24–232:2.)  Though Goldie seemed all right on

6

August 23, she had vomiting and bloody diarrhea on August 24 and diarrhea on August 25.  (*Id.* 238:20–240:11, 247:12–16.)  Dr. Moore testified that he believed Rimadyl to be the cause of Goldie's problems on August 24 and 25 and told the Munozes to stop using it.  (Moore Dep. 45:14–18.)  The Munozes later received a full refund for ProMeris from their vet.  (Silver Dep. 30:9–13.)  While they claim that ProMeris harmed their dog, they do not claim that it was not effective.  (Carlos Munoz Dep. 32:24–33:7, 71:24–72:6, 144:7–13.)

Meanwhile, Valerie Mahtani of Short Hills, New Jersey, received a free sample of ProMeris from her veterinarian in August or September 2008.  (Mahtani Dep. 62:4.)  She called the ProMeris hotline to ensure proper use, but noticed after she applied it to her dog, Flake, that the dog began to scratch himself and that he had bugs all over him. (*Id.* 66:7–10; 80:8–9; 81:15–82:5.)  The information Mahtani received from the ProMeris hotline indicated that the fleas would die off.  (*Id.* 82:6–13, 85:24, 87:21, 86:12, 93:5.)  However, the fleas did not die without treatment other than ProMeris.  (*Id.*)  Mahtani claims that Flake's constant scratching caused him to bleed from his head, ears, and rectum.  (*Id.* 91:1–11.)  Mahtani testified that her veterinarian, Dr. Mitterman, told her that ProMeris caused all of Flake's problems.  (*Id.* 126:23–25, 129:10–15, 134:2–12.)  Dr. Mitterman declined to appear for a deposition.  Mahtani only claims that ProMeris is ineffective, and not that it is harmful.  (*Id.* 154:15–25.)

### E. The Veterinarians' Viewpoints

Dr. Silver testified that of the 131 boxes of ProMeris he dispensed, only four were returned, and he does not know why.  (Silver Dep. 13:19–14:9. 14:15–20, 28:21–29:4.)  He stated, however, that he does not think they were returned for being ineffective.  (*Id.* 36:2–15.)  In addition, he testified that many of his customers were satisfied with ProMeris and that some still request it, though he always expects—with any product—for some customers to complain

about its effectiveness.  (*Id.* 36:2–15, 113:16–114:16.)  Nevertheless, he claimed to have lost

clients over ProMeris.  (*Id.* 109:7–18.)  All of the doctors stated that they never expect a product

to be 100 percent effective.  (*Id.* 36:2–15; Zolkiewicz Dep. 28:9–13, 72:10–22; Moore Dep.

17:19–18:13.)

## III. Procedural History

Plaintiffs filed their original complaint in the District of New Jersey on December 19,

2008, setting forth claims for violations of the NJCFA, violations of every other state consumer

protection statute, unjust enrichment, breach of the implied warranty of merchantability, and

breach of express warranty.  [D.E. 1.]  On April 14, 2009, plaintiffs filed an amended complaint,

which slightly altered the factual allegations of the original complaint but did not change any of

the counts asserted.  [D.E. 16.]  Defendant moved to dismiss the amended complaint [D.E. 18],

and the Court granted the motion as to Count II—which asserted violations of the various state

consumer protection statutes—but denied it as to the remainder of the complaint.  [D.E. 50.]

Specifically, the Court rejected defendant's argument that the New Jersey Products Liability Act

precluded plaintiffs' NJCFA claim.  Plaintiffs then filed the current motion to certify a

nationwide class.  [D.E. 144.]  Defendant has filed a motion for summary judgment [D.E. 181],

but that motion is not the subject of this opinion.

## IV. Legal Standard for Class Certification

To certify a class, plaintiffs bear the burden of establishing the requirements of Fed. R.

Civ. P. 23(a), of which there are four:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there
> are questions of law or fact common to the class, (3) the claims or defenses of the
> representative parties are typical of the claims or defenses of the class, and (4) the
> representative parties will fairly and adequately protect the interests of the class.

In addition, plaintiffs must demonstrate that the class falls under one of the three categories set

out in Rule 23(b).  *Baby Neal, for and by Kanter v. Casey*, 43 F.3d 48, 55 (3d Cir. 1994).  In this

case, plaintiffs seek certification under Rule 23(b)(3) only.  (Pls.' Mot. Class Certif. at 24.)  Rule

23(b) states that if the Rule 23(a) requirements are satisfied, a class action may be maintained if

"the court finds that the questions of law or fact common to class members predominate over any

questions affecting only individual members, and that a class action is superior to other available

methods for fairly and efficiently adjudicating the controversy."  These two requirements are

known as predominance and superiority, *In re Hydrogen Peroxide Antitrust Litig.*, 552 F.3d 305,

310 (3d Cir. 2008), and in analyzing them, a court should address four pertinent factors:

> (A) the class members' interests in individually controlling the prosecution or
> defense of separate actions; (B) the extent and nature of any litigation concerning
> the controversy already begun by or against class members; (C) the desirability or
> undesirability of concentrating the litigation of the claims in the particular forum;
> and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D).

"Class certification is proper only 'if the trial court is satisfied, after a rigorous analysis,

that the prerequisites' of Rule 23 are met."  *In re Hydrogen Peroxide*, 552 F.3d at 309 (footnote

omitted) (citing *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 161 (1982)).  A court must

thoroughly examine the factual and legal allegations relevant to the certification decision and

may need to examine matters beyond the pleadings.  *Id.* at 309, 316 (citing *Newton v. Merrill

Lynch, Pierce, Fenner & Smith*, 259 F.3d 154, 166 (3d Cir. 2001)).  Indeed, "the decision to

certify a class calls for findings by the court, not merely a 'threshold showing' by a party, that

each requirement of Rule 23 is met," and any factual findings "must be made by a preponderance

of the evidence."  *Id.* at 307, 320. "[T]he court must resolve all factual or legal disputes relevant

to class certification, even if they overlap with the merits—including disputes touching on

elements of the cause of action." *Id.* The court may "consider the substantive elements of the plaintiffs' case in order to envision the form that a trial on those issues would take," *id.* at 317, and in doing so, the court "should make its own independent findings and need not afford plaintiff[s'] claims any deference." *Agostino v. Quest Diagnostics Inc.*, 256 F.R.D. 437, 449 (D.N.J. 2009) (citing *In re Hydrogen Peroxide*, 552 F.3d at 317 n.18). While plaintiffs need not establish conclusively the elements of their substantive claims at the class certification stage, they must demonstrate that the elements of their claims are "capable of proof at trial through evidence that is common to the class rather than individual to its members." *In re Hydrogen Peroxide*, 552 F.3d at 311–12.

In this case, plaintiffs fail to meet the requirements of Rule 23(b)(3) because, for the reasons that follow, common questions of fact do not predominate.

## V. Predominance Under Rule 23(b)(3)

Under Rule 23(b)(3), a class that meets the requirements of Rule 23(a) will be certified "if the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Four factors are relevant:

> (A) the class members' interests in individually controlling the prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already begun by or against class members; (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and (D) the likely difficulties in managing a class action.

Fed. R. Civ. P. 23(b)(3)(A)–(D).

### A. The Standard for Establishing Predominance

*In re Hydrogen Peroxide* stated the standard for determining whether common questions

of law and fact predominate over individual issues under Rule 23(b)(3).

> Predominance "tests whether proposed classes are sufficiently cohesive to warrant
> adjudication by representation," *Amchem*, 521 U.S. at 623, 117 S. Ct. 2231, a
> standard "far more demanding" than the commonality requirement of Rule 23(a),
> *id.* at 623–24, 117 S. Ct. 2231, "requiring more than a common claim," *Newton*,
> 259 F.3d at 187.  "Issues common to the class must predominate over individual
> issues. . . ." *In re Prudential Ins. Co. Am. Sales Practice Litig.*, 148 F.3d 283,
> 313–14 (3d Cir. 1998).  Because the "nature of the evidence that will suffice to
> resolve a question determines whether the question is common or individual,"
> *Blades v. Monsanto Co.*, 400 F.3d 562, 566 (8th Cir. 2005), "'a district court must
> formulate some prediction as to how specific issues will play out in order to
> determine whether common or individual issues predominate in a given case,'" *In
> re New Motor Vehicles Can. Exp. Antitrust Litig.*, 522 F.3d 6, 20 (1st Cir. 2008)
> [hereinafter New Motor Vehicles] (quoting *Waste Mgmt. Holdings, Inc. v.
> Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000)).  "If proof of the essential elements
> of the cause of action requires individual treatment, then class certification is
> unsuitable."  *Newton*, 259 F.3d at 172.  Accordingly, we examine the elements of
> plaintiffs' claim "through the prism" of Rule 23 to determine whether the District
> Court properly certified the class.  *Id.* at 181.

552 F.3d at 310–11 (3d Cir. 2008).

For common questions of fact to predominate, they must be "both numerically and

qualitatively substantial in relation to the issues peculiar to individual class members."  *In re

Mercedes-Benz Antitrust Litigation*, 213 F.R.D. 180, 186 (D.N.J. 2003) (*Mercedes-Benz I*).  The

existence of individual issues will not necessarily defeat certification, but "they must be less

significant than the common issues and must not be so unmanageable as to preclude class

treatment."  *Dal Ponte v. Am. Mortg. Exp. Corp.*, 2006 WL 2403982, at *7 (D.N.J. Aug. 17,

2006).  To determine whether common issues of fact predominate, the Court must examine both

the factual issues involved and the applicable law.  *Szczubelek v. Cendant Mortgage Corp.*, 215

F.R.D. 107, 121 (D.N.J. 2003).

**B. Common Questions of Fact Do Not Predominate**

**1. Consumer Fraud Act**

The named plaintiffs' primary allegation is that, in violation of the NJCFA, defendant misrepresented that ProMeris was efficacious and safe, when in fact it is ineffective and harmful to dogs.  (Moving Br. at 1–2.)  Even assuming that the NJCFA applies, there are individual factual issues that demonstrate that this case is not amenable to class treatment.

To succeed on a claim under the NJCFA, a plaintiff must establish that "(1) the defendant(s) engaged in deception, fraud, false pretense, false promise, or misrepresentation; (2) the plaintiff(s) suffered an ascertainable loss; and (3) a causal relationship can be established between the unlawful conduct and the loss." *Elias v. Ungar's Food Prods., Inc.*, 252 F.R.D. 233, 238 (D.N.J. 2008) (citing N.J.S.A. 56:8-2; *Weinberg v. Sprint Corp.*, 173 N.J. 233, 236–37 (2002)).

Plaintiffs assert that ProMeris is ineffective and causes harm.  Because of the nature of these claims, establishing deception under the NJCFA will require proof that the product is in fact defective.  Other courts in this District have found that proving a defect is a highly individualized inquiry unsuitable for class treatment.  *See, e.g.*, *Laney v. Am. Standard Cos.*, 2010 WL 3810637 (D.N.J. Sept. 23, 2010); *Payne v. FujiFilm*, 2010 WL 2342388 (D.N.J. May 28, 2010); *Chin v. Chrysler Corp.*, 182 F.R.D. 448 (D.N.J. 1998).  In *Chin*, individuals who purchased Chrysler cars sued the manufacturer on theories of breach of warranty and common law fraud, alleging that the anti-lock brake systems were defective.  182 F.R.D. at 450–51.  Judge Lifland determined that common factual issues did not predominate because "most of the potential class members have never experienced any problems with their ABS systems.  Proving

12

a class-wide defect where the majority of class members have not experienced any problems with the alleged defective product, if possible at all, would be extremely difficult." *Id.* at 455.

Similarly, in *Payne*, plaintiff sought certification of a class of FujiFilm FinePix 3800 camera purchasers; she asserted breach of warranty and NJCFA claims, alleging that the cameras had a defect in their battery and/or power assemblies. 2010 WL 2342388, at *1. Judge Brown noted that only four percent of purchasers returned their cameras for any reason, and only one to two percent of purchasers returned their cameras due to a power problem. *Id.* at *5. Moreover, approximately 30 percent of the cameras that were returned for repair had some kind of power problem. *Id.* Judge Brown found that because no defect had manifested in a great majority of the proposed class, common factual issues did not predominate. *Id.* He also observed that any number of things could have caused the problems that did manifest. *Id.*

Furthermore, in *Laney*, plaintiffs, asserting claims under the NJCFA, sought to certify a class of purchasers of defendant American Standard's purportedly defective toilets. Just as Judges Lifland and Brown found in *Chin* and *Payne* that defects that had not manifested in a majority of the class could not be established by common proof, so did Judge Sheridan in *Laney*. 2010 WL 3810637, at *18 ("In order to establish injury and damages, the court would need to be presented with individualized experiences concerning each class member's circumstances.").

According to pre-approval efficacy studies, ProMeris performed at greater than 90 percent efficacy, and its performance was only slightly diminished by shampooing the dogs in the study or immersing them in water. In addition, a study published in the journal Veterinary Parasitology demonstrated that ProMeris performed at or near 100 percent efficacy for 28 days after it was administered. All three veterinarians confirmed that they never expect any product to be 100 percent effective, and Silver testified that he does not believe any of his customers

returned their ProMeris because it was ineffective.  With such high marks, it would be nearly impossible to identify the consumers for whom ProMeris did not work without closely examining each ProMeris purchaser's unique circumstances.  Indeed, because ProMeris proved to be highly effective, the Court would have to ask such individualized questions as how each user applied ProMeris and whether each user's dog was at any point in the vicinity of another flea-infested dog that had not been treated.

The safety and toxicology studies present the same issues.  In the EPA-requested testing, one dog died, but FDAH concluded that the death was unrelated to ProMeris.  Moreover, of the 293 dogs treated with ProMeris in the European field study, only 4 percent showed adverse reactions that were linked to the product.  While more adverse events were reported in FDAH's study of its clients' dogs, the company concluded that improper application was at fault.  In addition, while Wyeth sold 2,211,990 doses of ProMeris in 2008, it received only 3,195 adverse event reports from purchasers.  These reports accounted for only 0.14 percent of the total doses sold.  Wyeth characterizes this rate as within the "new product effect."  While plaintiffs do not directly challenge this characterization, they do seek to undermine it with additional statistics, including an extrapolation from Wyeth's adverse event rate.  First, they contend that while ProMeris only had a 3 percent market share in 2009, it accounted for 7 percent of the adverse event complaints forwarded to the EPA.  Second, they assert that because ProMeris is sold in packs of three or six doses, Wyeth's percentage should be multiplied by at least three, and because people tend to underreport human illnesses by a factor of 100—and people would naturally report their pets' illnesses even less frequently—Wyeth's percentage should be multiplied by 100, as well.  (Reply Br. at 2 n.4.)  Therefore, as plaintiffs' counsel stated at oral argument, the real adverse event rate is likely closer to 42 percent.  (Oral Arg. Tr. 72:3–22.)

14

First, the Court notes that plaintiffs' assertion that 42 percent of ProMeris purchasers encountered some sort of adverse effect is unsupported by any facts in the record apart from their own extrapolation. Second, even accepting the underlying point—that adverse events were underreported—and recognizing that some dogs suffered harm, the fact remains that the vast majority of dogs treated with ProMeris have not suffered harm. On a related note, while both sides concede that amitraz can cause harm when it enters the bloodstream, that does not mean that it causes harm in every case or that it even enters the bloodstream in every case. Therefore, to the extent plaintiffs seek to proceed on a theory that ProMeris was defective because it caused harm, only an intensive inquiry into whether each class member's dog suffered harm and what proximately caused the harm will prove plaintiffs' theory.

Furthermore, plaintiffs do not address the NJCFA's "ascertainable loss" element, under which plaintiffs must establish that they paid for a product and "got something less than what had been promised." *Elias*, 252 F.R.D. at 249. "Under the NJCFA, loss is not assumed. Rather, it is an element that must be proven by each plaintiff." *Szczubelek*, 215 F.R.D. at 122 (citing *Meshinsky v. Nichols Yacht Sales, Inc.*, 110 N.J. 464, 473 (1988)). In this case, it is far from certain that each class member got less than what he or she was promised, and making that determination requires an individual inquiry into each class member's circumstances. First, like Mahtani, who received a free sample, and the Munozes, who got a full refund, some class members might not have paid for ProMeris. Second, some class members might have gotten what was promised, but used ProMeris incorrectly. Finally some purchasers might have gotten what was promised because they used ProMeris properly and were satisfied with it.

In this regard, the case at bar can be distinguished from *Elias*. In this case, the evidence demonstrates that 90 percent or more of the class plaintiffs seek to certify got exactly what they

had been promised: ProMeris worked, and it did not harm their dogs.  In *Elias*, the evidence that purchasers did not get what they were promised was contained entirely within the box: the package said there was less fat in the food products than there actually was.  252 F.R.D. at 249. The difference between what was promised and what was received was specific and proven, and therefore, just by buying the product, purchasers got less than what they were promised.  *Id.* That is not the case here.  ProMeris proved highly effective in studies and was the subject of only a small number of adverse event reports.

Plaintiffs attempt to avert a finding that individual issues predominate by arguing that Wyeth's misrepresentations comprised statements that ProMeris is equally or more effective, and no more harmful, than other leading flea and tick treatments.  (Reply Br. at 2–3.)  Setting aside for the moment the question of whether Wyeth actually made any such representations—a question that is hotly contested—the fine distinction plaintiffs make does not change the analysis.  If ProMeris worked for an individual purchaser just as well as Frontline or Advantage would have and did not cause harm, then that purchaser suffered no ascertainable loss and got exactly what he or she paid for.  Under plaintiffs' "comparative effectiveness" theory, the Court would still be obligated to examine each purchaser's circumstances.  This is especially true in the case at bar, where the difference between the effectiveness of Frontline and ProMeris was mere tenths of a percent.  *See* ProMeris Efficacy Review, attached to Chaleff Aff. as Ex. G; Veterinary Parasitology Vol. 150, attached to George Decl. as Ex. 4, at 214.

Just as in *Chin*, *Payne*, and *Laney*, the defect asserted did not manifest itself in a vast majority of the class sought to be certified.  While plaintiffs correctly note that "[p]redominance is a test readily met in certain cases alleging consumer . . . fraud" (Reply Br. at 13 (quoting *In re Hydrogen Peroxide*, 522 F.3d at 321–22)), it is also true that the Court must conduct a "rigorous

16

analysis," and that "the unique facts of each case will generally be the determining factor governing certification." *In re Hydrogen Peroxide*, 522 F.3d at 322–23 (quoting Robinson v. Tex. Auto. Dealers Ass'n, 387 F.3d 416, 420-21 (5th Cir.2004)).  After a thorough examination of the unique facts of this case, the Court finds that common issues of fact do not predominate with regard to plaintiffs' NJCFA claim.

### 2. Unjust Enrichment

Under New Jersey law, an unjust enrichment claim requires that plaintiff "show both that defendant received a benefit and that retention of the benefit without payment would be unjust." *VRG Corp. v. GKN Realty Corp.*, 135 N.J. 539, 554 (1994).  "Plaintiff must prove 'that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights.'" *Agostino*, 256 F.R.D. at 465 (citing *VRG Corp.*, 135 N.J. at 554).

For the same reasons individual issues predominate with regard to plaintiffs' NJCFA claim, they predominate with regard to the unjust enrichment claim, as well.  In determining whether defendant was enriched beyond its contractual rights, the Court will have to look into whether ProMeris did what it was supposed to do.  The majority of ProMeris purchasers never had problems with the product; thus, these satisfied purchasers received the remuneration they expected.  *See In re Canon Cameras*, 237 F.R.D. 357, 360 (S.D.N.Y. 2006) ("A plaintiff who purchases a digital camera that never malfunctions over its ordinary period of use cannot be said to have received less than what he bargained for when he made the purchase.").  Proving each class member's unjust enrichment claim will therefore require an inquiry into each class member's individual circumstances.

One of the several *In Re Mercedes-Benz* opinions issued by Judge Debevoise serves as a counterpoint. There, a putative class of car buyers alleged that Mercedes-Benz knew that the analog emergency response system installed in its vehicles would soon be obsolete, but failed to inform consumers of that fact when selling the vehicles. 257 F.R.D. 46, 48 (D.N.J. 2009) (*Mercedes-Benz II*). Judge Debevoise observed that the plaintiffs had, by definition, established the first element of an unjust enrichment claim: they bought a Mercedes and subscribed to the analog Tele Aid technology installed in it. 257 F.R.D. at 72. Judge Debevoise determined that the second element of unjust enrichment only demanded an inquiry into Mercedes' conduct because it required an examination of whether Mercedes knew the analog technology would soon become obsolete and lied about that fact when selling its vehicles. *Id.* at 72–73. In the case at bar, the facts are markedly different. Because the vast majority of ProMeris purchasers never had any problems with it, the Court cannot merely focus on the conduct of the defendant to determine whether the purchasers received adequate remuneration.

Moreover, because Mahtani received ProMeris for free and the Munozes got a full refund, the Court cannot be sure that each class member conferred a benefit on defendant. In *Agostino*, Judge Chesler recognized that in the 51 billing transactions at issue in that case, the prospective plaintiffs actually paid Quest in only 17 instances. *Id.* Of those 17 instances, three payments were made for amounts due and owing, and five payments were reimbursed after Quest realized that the amounts were not actually owed. *Id.* Judge Chesler concluded that determining whether plaintiffs had conferred a benefit on Quest required an inquiry into each of the class member's billing transactions, and therefore, common issues of fact did not predominate. *Id.* In this case, neither of the named plaintiffs actually conferred a benefit on defendant, raising the possibility that only a small number of class members did so. Determining

18

which users paid for ProMeris requires an examination of every transaction, an inquiry that is complicated by the fact that consumers can only obtain ProMeris through their veterinarians.

For the foregoing reasons, class certification of plaintiffs' unjust enrichment claim is unwarranted.

### 3. Breach of Warranty

Plaintiffs' final claim is that defendant warranted that ProMeris was safe when used as directed, and that defendant breached this warranty by selling to plaintiffs a product that is unsafe even when used as directed.  (Moving Br. at 23–24.)  New Jersey's version of the Uniform Commercial Code-Sales governs express warranty claims.  *Elias*, 252 F.R.D. at 250 (citing N.J.S.A. 12A:2-313).  An express warranty is

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.
> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description.
> (c) Any sample or model which is made part of the basis of the bargain creates an express warranty that the whole of the goods shall conform to the sample or model.

N.J.S.A. 12A:2-313(1).  To establish a breach of warranty claim, a plaintiff need not demonstrate reliance, *Bregman Screen & Lumber Co. v. Bechefsky*, 16 N.J. Super. 35, 41 (App. Div. 1951) ("[N]o proof of the buyer's reliance on the warranty is necessary other than that the seller's statements were of a kind which naturally would induce the purchase."), or privity, *Alloway v. Gen. Marine Indus., L.P.*, 149 N.J. 620 (1997), and it will be presumed that the promise was the basis of the bargain once the "buyer has become aware of the affirmation of fact or promise," *Viking Yacht Co. v. Composites One LLC*, 496 F. Supp. 2d 462, 469 (D.N.J. 2007).

Nevertheless, as Judge Lifland stated in *Chin*, proving that ProMeris is defective when used as directed will be crucial to establishing that Wyeth breached the warranty.  *See Chin*, 182

F.R.D. at 455–56.  As noted above, determining whether ProMeris is defective demands an individualized inquiry, and as such, plaintiffs' breach of warranty claim is ill suited for class treatment.

**VI. Conclusion**

Based on the foregoing, individual issues of fact predominate over common issues, and plaintiffs' motion for class certification is denied.

<u>/s/ Katharine S. Hayden</u>

June 30, 2011                                        Katharine S. Hayden, U.S.D.J.